**RUTIGLIANO PAPER STOCK, INC.,**
George Rutigliano and Joseph
Rutigliano, Plaintiffs,

v.

**UNITED STATES GENERAL SERVICES ADMINISTRATION,** Metropolitan Transportation Authority, New York City Transit Authority, United States Department of Transportation and United States Coast Guard, Defendants.

Civil Action No. CV–97–514 (DGT).

United States District Court,
E.D. New York.

June 10, 1997.

Thomas P. Puccio, New York City, Craig A. Eaton, Brooklyn, NY, for Plaintiffs.

Zachary W. Carter, U.S. Attorney, E.D. of N.Y. by Vincent Lipari, Brooklyn, NY, for Defendants U.S. General Services Admin., U.S. Dept. of Transp., U.S. Coast Guard.

Richard Schoolman, Office of Martin B. Schnabel, General Counsel, NYC Transit Authority, Brooklyn, NY, for Defendants New York City Transit Authority, Metropolitan Transit Authority.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiffs Rutigliano Paper Stock, Inc., George Rutigliano, and Joseph Rutigliano ("the Rutiglianos") sought a preliminary injunction enjoying various government agencies from awarding contracts to other contractors, on the ground that the procedures employed by the defendant United States General Services Administration ("GSA") pursuant to subpart 9.4 of the Federal Acquisition Regulations System ("FAR") (48 C.F.R. §§ 9.401–07) are unconstitutional facially and as applied. The defendant federal agencies (the United States Department of Transportation, the United States Coast Guard, and GSA, collectively, the "federal defendants") opposed the motion; the defendants Metropolitan Transportation Authority ("MTA") and New York City Transit Authority ("NYCTA") have also opposed the motion and have cross-moved to dismiss the complaint against them. On April 14, 1997, I denied the plaintiffs' motion with respect to the NYCTA. This opinion explains the basis for that denial and resolves the remainder of the pending motions.

### Background

### (a) Federal Acquisition Regulations

The FAR are a set of regulations promulgated by the GSA to further the uniform regulation and procurement of government contracts. Agencies are to award contracts to responsible bidders only; suspension is a method to effectuate this policy. *See* FAR 9.402(a). Suspension of a contractor is a discretionary act that is to be "imposed only in the public interest for the Government's protection and not for purposes of punishment." FAR 9.402(b). A suspension may be imposed, upon adequate evidence, for a variety of causes, including the commission of a fraud or other offense that "indicat[es] a lack of business integrity or business honesty." FAR 9.407–2(a)(7). An indictment constitutes adequate evidence.[1] *See id.*

Upon suspension, a contractor is given notice that he has the right, within thirty days after the receipt of the notice, to "submit, in person, in writing, or through a representative, information and argument in opposition to the suspension, including any additional specific information that raises a genuine dispute over the material facts." FAR 9.407–3(c)(5). Procedures for contesting suspension shall be as "informal as practicable, consistent with principles of fundamental fairness." FAR 9.407–3(b). The sole authority for suspension determinations rests with the Special Assistant for Contractor Integrity (the "suspending official"), here, Don-

---

1. FAR 9.407–2 ("Causes for suspension") provides:

 (a) The suspending official may suspend a contractor suspected, upon adequate evidence, of—(1) Commission of fraud or a criminal offense in connection with (i) obtaining, (ii) attempting to obtain, or (iii) performing a public contract or subcontract; (2) Violation of Federal or State antitrust statutes relating to the submission of offers; (3) Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property ... (7) Commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects the present responsibility of a Government contractor or subcontractor.
 (b) Indictment for any of the causes in paragraph (a) above constitutes adequate evidence for suspension.
 FAR 9.407–1(b) provides further guidance to the suspending official:
 (1) Suspension is a serious action to be imposed on the basis of adequate evidence, pending the completion of investigation or legal proceedings, when it has been determined that immediate action is necessary to protect the government's interest. In assessing the adequacy of the evidence, agencies should consider how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result. This assessment should include an examination of basic documents such as contracts, inspection reports, and correspondence. (2) The existence of a cause for suspension does not necessarily require that the contractor be suspended. The suspending official should consider the seriousness of the contractor's acts or omissions and may, but is not required to, consider remedial measures or mitigating factors, such as those set forth in 9.406–1(a). A contractor has the burden of promptly presenting to the suspending official evidence of remedial measures or mitigating factors when it has reason to know that a cause for suspension exists. The existence of nonexistence of any remedial measures or mitigating factors is not necessarily determinative of a contractor's present responsibility.

ald J. Suda. *See* Decl. of Donald J. Suda dated March 10, 1997 ("Suda Decl.") ¶¶ 1, 3. The suspending official also reviews any material submitted to contest the suspension determination. *See id.* In making his decision, the suspending official can consider any evidence that the contractor wishes to offer—including evidence that contradicts the acts underlying the indictment—as well as oral or written argument contesting the suspension. *See* Suda Decl. ¶ 12; Tr. of Oral Argument of April 14, 1997 ("Tr.") at 3.

If the suspension is not based on an indictment and the contractor's submission raises a question as to the material facts, the contractor is afforded a full hearing before an Administrative Law Judge ("ALJ"), with an opportunity to cross-examine witnesses. *See* Suda Decl. ¶ 19. If, however, the suspension is based on an indictment, "the suspending official's decision shall be based on all the information in the administrative record, including any submission made by the contractor." FAR 9.407–3(d)(1). Thus, while a contractor suspended on the basis of an indictment may submit additional evidence of any type, there are no additional fact finding proceedings. *See* Suda Decl. ¶ 16. GSA will, however, consider other factors, including mitigating circumstances, the gravity of the charged offense, the probability of guilt, and "well-founded claims of innocence." *See id.*

If imposed, a suspension "shall be for a temporary period pending the completion of investigation and any ensuing legal proceedings...." FAR 9.407–4(a). A suspension shall last for twelve months, "unless an Assistant Attorney General requests its extension, in which case it may be extended for an additional 6 months. In no event may a suspension extend beyond 18 months, unless legal proceedings have been initiated within that period." FAR 9.407–4(b). A legal proceeding is "any criminal proceeding." FAR 9.403. The precise meaning of this phrase is unclear. In a letter and at oral argument, the federal defendants stated that legal proceedings are held to have commenced upon

the start of trial, jury selection, or "significant pretrial action," but did not particularize this last statement further. Ltr. from Vincent Lipari, Esq. Ass't United States Att'y to court dated April 8, 1997, at 1; Tr. at 9. However, an indictment does not constitute a legal proceeding. *See* Tr. at 13.

The suspending official's decision, made with or without additional fact finding proceedings, is final; there is no appeal to a higher authority within the GSA. *See* Suda Decl. ¶ 3. GSA decisions are, however, reviewable under the Administrative Procedure Act ("APA").[2] *See Commercial Drapery Contractors, Inc. v. United States,* No. 96–2818, 1997 WL 68203, at *2 (D.D.C. Feb.12, 1997).

**(b) Facts**

George Rutigliano is President and Joseph Rutigliano is Vice President of Rutigliano Paper Stock, Inc., a carting company that provides waste removal services to various governmental entities in the New York City area. On June 16, 1996, the Rutiglianos and Rutigliano Paper Stock, Inc. were indicted in New York State Supreme Court. This indictment charged the Rutiglianos with two counts of combination in restraint of trade, one count of second degree grand larceny, and seven counts of falsifying business records. *See* Indictment No. 5009–96, ("first indictment") attached to Pls.' Mot. for Order to Show Cause for Prelim. Inj. dated February 6, 1997 ("PI"). Subsequently, the Rutiglianos were again indicted on November 7, 1996; this indictment realleges and supersedes some of the charges in the June 1996 indictment. *See* Affirm. of Thomas P. Puccio, Esq. counsel for plaintiffs, date December 7, 1996, attached to PI. As of this date, trial has not commenced on either the first or second indictment; the Rutiglianos have a motion pending in state court seeking dismissal or reassignment of their case on the ground that their right to a speedy trial has been violated.

Subsequent to the first indictment GSA informed the Rutiglianos that they would be

---

**2.** 5 U.S.C. § 706(2)(A) provides that a court reviewing informal agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...."

suspended, effective July 24, 1996. The letter notice stated that the suspension was made pursuant to the FAR, that it was temporary, and that the Rutiglianos or their representative could submit "information and argument in opposition to the suspension" within thirty days. Puccio Reply Aff. dated March 28, 1997 ("Reply Aff."), Ex. A, Notice of Suspension dated July 24, 1996. The notice also stated that the Rutiglianos's names would be published in the "List of Parties Excluded from Federal Procurement and Non–Procurement Programs," and that no executive branch agency would enter into, renew, or extend a transaction that the Rutiglianos participated in, unless the head of the transacting agency granted a written exemption. *See id.* Attached to the notice was a "Memorandum of Decision," which recited the fact that the Rutiglianos had been indicted in New York, and that this indictment constituted adequate evident for their suspension, pursuant to FAR 9.407–2(a)(1) and (7). The decision also stated that the suspension "is necessary to protect the Government's interests pending the completion of [the criminal proceeding]." *Id.* The suspension was effective immediately, and would last "pending the completion of legal proceedings ... in New York." *Id.*

Subsequently, several other agencies terminated their contracts with the Rutiglianos on the basis of either the suspension or the indictment. *See* Affirm. of Ass't Dist. Att'y Gerald P. Conroy ¶¶ 10–18, attached to PI.[3] Thus, on December 10, 1996, the NYCTA notified the Rutiglianos that it would deem them "not responsible" for a solicitation that the Rutiglianos had submitted; the decision was based on the GSA suspension and the indictments. *See* Ltr. from NYCTA Procurement Specialist Katie Dickie to Joseph Rutigliano dated December 10, 1996, Ex. B, Reply Aff.

With respect to GSA's suspension, the Rutiglianos requested a meeting which as to have been held in October, 1996. For various reasons, the meeting was not held until

January 28, 1997. Present at the hearing were Special Assistant Suda, his staff, and the Rutiglianos' counsel Craig Eaton. *See* Suda Decl. ¶¶ 1–7, 9–11. In his declaration, Suda states:

> [GSA] told Mr. Eaton that in determining whether to continue the suspension, or to permit a waiver, we would consider any documents, review any written presentation—in whatsoever form, whether in letter, brief, declaration or affidavit form— and would listen to statements and factual recitations made by as many ... persons as plaintiffs wished to present.

> \* \* \* \* \* \*

> At the meeting, Mr. Eaton told us that his clients were innocent and had been indicted to bring pressure on other defendants to plead guilty. He provided no details to support plaintiffs' claims of innocence and, instead, told us he could not discuss the matter because of the indictment....

> Mr. Eaton did not address the allegations of the indictment, other than to make a conclusory protest of his clients' innocence, nor did he allude to any mitigating circumstances or remedial measures. We told Mr. Eaton that he and his clients had not provided any specific information which would provide a basis to reinstate plaintiffs.

Suda Decl. ¶¶ 12, 14, 15. Since that time, and upon this court's inquiry, plaintiffs have indicated that they would submit to GSA "affidavits[,] ... third-party testimony and documentary evidence demonstrating, among other things, ... [that] the allegations in the indictment against plaintiffs are false...." Ltr. from Puccio dated April 11, 1997.

On January 31, 1997, plaintiffs filed this action against the federal defendants, and simultaneously moved for a temporary restraining order ("TRO") preventing the United States Coast Guard from terminating two contracts with plaintiffs. A hearing was held

---

**3.** These contracts were: a contract with FedCap Rehabilitation Services for waste removal at 26 Federal Plaza and a contract with the Coast Guard for waste removal on Staten Island. *See* Affirm. of Ass't Dist. Att'y Gerald P. Conroy ¶¶ 11–14, attached to PI. Additionally, the Port Authority of New York and New Jersey, and the New York City Department of Sanitation canceled contracts with the Rutiglianos as a result of their indictment. *See id.*

the same day, at which time the request for a TRO was denied, and the motion for an injunction was adjourned. Another hearing was held on February 6, 1997; again plaintiffs' motion for a TRO was denied, and plaintiffs indicated that they would add the MTA and NYCTA as defendants. At a hearing held on the motion on February 26, 1997, the parties agreed to a briefing schedule, and the hearing was adjourned until April 14, 1997, at which time oral argument was heard.

Plaintiffs sought a preliminary injunction enjoining the federal defendants from suspending or canceling any contracts between the Rutiglianos and the United States; enjoining the federal defendants from awarding any contracts, work orders or other agreements to other contractors on the basis of a suspension imposed by the defendant General Services Administration ("GSA"); enjoining the MTA and the NYCTA from suspending, canceling, or otherwise awarding a contact based on NYCTA solicitation number 9616730 ("NYCTA contract"); and enjoining GSA from either recommending cancellation, suspension or termination, or canceling, suspending, or terminating any contract between the Rutiglianos and any government agency on the basis of the GSA's decision to suspend the Rutiglianos because of the indictment.

## Discussion

### (a) Due Process Interests

 The Rutiglianos seek a preliminary injunction enjoining several government agencies from acting or awarding contracts, on the ground that the FAR, on its face, violates the Rutiglianos's due process rights. Because the Rutiglianos seek to enjoin the operation of a governmental regulation, they must demonstrate both irreparable harm and a likelihood of success on the merits. *See Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (holding that a preliminary injunction seeking to enjoin " 'government action taken in the public interest pursuant to a statutory or regulatory scheme' " must show a likelihood of success) (quoting *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). Here, it is not seriously disputed that the suspension may result in irreparable injury to plaintiffs; the

almost total loss of their business and inability to bid on new contracts as a result of the suspension constitutes irreparable harm that cannot be remedied by monetary damages alone. *See Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970). Thus, the critical issue is whether plaintiffs can establish a likelihood of success on any of their challenges to the FAR. Because they have failed to do so, their request for an injunction is denied.

The Rutiglianos advance several arguments in support of their position that the FAR impermissibly infringe on their procedural due process rights. First, plaintiffs argue that by barring a fact finding hearing into the facts underlying the indictment, the regulations prevent plaintiffs from having a meaningful hearing. Second, plaintiffs assert that the regulations are constitutionally infirm because they do not provide a standard for the exercise of the hearing officer's discretion. Third, the regulations do not place a limit on the temporal length of the suspension. Fourth, the regulations do not provide for an impartial decisionmaker because the official who makes the initial suspension also presides over the hearing. Finally, the regulations are unconstitutional as applied, in light of the potential delay in the trial on the indictment that forms the basis for the suspension.

 As a threshold issue, before the Rutiglianos can challenge the adequacy of the process due a suspended contractor, they must show that they have a protectable liberty interest, since not every interest is protected by the due process clause. *See Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 628–29 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997). Here, plaintiffs have a protected liberty interest because the suspension imposed by GSA is based on a charge of fraud and dishonesty. *See Old Dominion Dairy Prods., Inc. v. Secretary of Defense,* 631 F.2d 953, 965–66 (D.C.Cir.1980); *Mainelli v. United States,* 611 F.Supp. 606, 613 (D.R.I.1985) (citing cases). Thus, the question then becomes what process is due. *See Cleveland Bd. of Educ. v. Loudermill,*

470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985).

■■■ The question of what process is due can only be answered with reference to the interests affected in each case, for as the Supreme Court has noted, " ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961)). Due process does contain the conception that "the opportunity to be heard must be 'at a meaningful time and in a meaningful manner.' " *Barry v. Barchi,* 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). "At some point, a delay in the post-termination hearing would become a constitutional violation." *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985) (holding that in the employment context a nine month post-termination administrative process "is not, of course, unconstitutionally lengthy per se").

■■■ The framework for determining the adequacy of the process due in a particular situation is set forth in *Mathews:*

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. at 903 (citation omitted).

■■■ The private interest at stake here is an important one, since a suspension may result in the loss of all or nearly all of a contractor's business. The length of the suspension may also be a significant factor. *See id,* at 341, 96 S.Ct. at 905–06. In the government contracting context several courts have considered the strength of this liberty interest and have held that its curtailment does not require a hearing prior to the suspension. *See Mainelli v. United States,* 611 F.Supp. 606, 614 (D.R.I.1985) (citing cases and noting that "prior decisional law has balanced the competing interests and held that a post-suspension hearing within thirty days is sufficient").

■■■ The risk of erroneous deprivation is not, in this context, a significant issue. A suspension based upon an indictment is made pursuant to the independent fact finding process that produced the indictment; as the Supreme Court has noted, this process is considered sufficiently reliable to effect a temporary but total deprivation of liberty. *See FDIC v. Mallen,* 486 U.S. 230, 241, 108 S.Ct. 1780, 1788, 100 L.Ed.2d 265 (1988). Moreover, a contractor facing suspension then has an opportunity to argue against imposition of the suspension on two grounds. First, the contractor may argue that the government's interest would not be served by the suspension. Second, the government interprets the FAR as allowing the contractor the opportunity to present evidence that rebuts the indictment.[4] The initial reliability of the indictment, coupled with the contractor's opportunity to rebut its conclusions, greatly minimizes the risk that an erroneous or irrational deprivation might occur.

Finally, with respect to the government's interests, the federal defendants note that there are two significant interests at stake here. First, the government has an interest in having responsible contractors perform its

---

4. The government's interpretation is premised on the fact that FAR 9.407–3(c)(5) does not limit in any way the type or kind of evidence a contractor may submit. *See* Suda Decl. ¶ 12 ("Within the bounds of reason and relevance, in making a determination there are few limits to the amount, type and form of evidence, information and argument which we will consider and the number of persons whom we will hear."); Tr. at 9–10 (AUSA Lipari: "Subsection [407–3(c)]5 has no limit on what the contractor may address and how he may address it.").

contracts. The Court of Appeals for the Fourth Circuit has noted in a similar context:

> The proper expenditure of tax dollars is, of course, a primary responsibility of government. It is not only correct for the government to question the integrity of a contractor who has been indicted for the manner in which he carried out [government] contracts, but failure to do so would be highly irresponsible.

*James A. Merritt & Sons v. Marsh,* 791 F.2d 328, 331 (4th Cir.1986). The second interest is an administrative one: "If every governmental decision required a full blown hearing involving all parties affected, the conduct of Government business would be greatly impaired." *Old Dominion Dairy Prods., Inc. v. Secretary of Defense,* 631 F.2d 953, 968 (D.C.Cir.1980).

### (b) Meaningful Notice and Opportunity to be Heard

Plaintiffs first contend that they are deprived of the opportunity for a meaningful post suspension hearing. Their argument is based upon the fact that the FAR provides that when a suspension is based on an indictment, there is no fact finding with regard to the facts underlying the indictment. They claim that although the FAR permits a contractor to submit additional evidence, this is an empty concession, in light of the fact that the indictment itself cannot be contested. In support of their argument, plaintiffs point to *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), *Angelilli v. Murphy,* No. 79 Civ. 5983, slip op. (S.D.N.Y. Dec. 28, 1979), and *Feinberg v. FDIC,* 420 F.Supp. 109 (D.D.C.1976). The federal defendants, citing *FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), respond that the plaintiffs have received all the process they are due.

Several Supreme Court decisions have sketched the contours of due process afforded an indicted government contractor. In *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), a horse trainer was suspended pursuant to a New York statute that authorized an immediate suspension for up to fifteen days upon the trainer's horse testing positive for drugs after a race. The statute did provide for a post-suspension hearing, but did not specify a time when the hearing should be held. The Supreme Court found the post-suspension remedy constitutionally infirm, because, in light of the fact that the statute did not provide for a prompt hearing on the suspension, "it is likely as not that Barchi and others subject to relatively brief suspensions would have no opportunity to put the State to its proof until they have suffered the full penalty imposed." *Id.* at 66, 99 S.Ct. at 2650.

In *FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), the Supreme Court considered the constitutionality of 12 U.S.C. § 1818(g), which authorized the FDIC to suspend (for up to ninety days without a hearing) any officer of a bank who had been indicted. The Court found the statute did not violate due process because of the public interest involved and the minimal risk of an erroneous deprivation. *See id.* 243, 108 S.Ct. at 1789. Notably, the Court relied on the existence of the indictment to justify the suspension, finding that the indictment provided a rational basis for the suspension. *See id.* at 244, 108 S.Ct. at 1789.

An earlier version of the statute at issue in *Mallen* had previously been held unconstitutional in *Feinberg v. FDIC,* 420 F.Supp. 109 (D.D.C.1976). At that time, § 1818(g) provided that the FDIC could suspend a bank official, but the statute did not provide a standard by which the agency could determine whether a suspension should be imposed. Additionally, the statute did not provide for *any* post-deprivation procedure, nor did it specify the length of the suspension. The *Feinberg* three judge panel found that in light of the deprivation the statute authorized, a suspended individual was entitled to some post-deprivation process. *See id.* at 118–20. Especially relevant here is the court's observation that the purpose of the hearing was not to determine the guilt or innocence of the affected individual, but rather, to provide the suspended individual with an opportunity to argue that suspension was not appropriate because it would not further the purpose of the statute. *See id,* at 118.

In *Angelilli,* plaintiffs were a group of New York City marshals who had been

indicted and subsequently suspended on corruption charges. Although the marshals were entitled to notice and an opportunity to be heard, their hearing was postponed until the conclusion of the criminal proceedings against them. *See Angelilli v. Murphy,* No. 79 Civ. 5983, slip op. at 31 (S.D.N.Y. Dec. 28, 1979). Judge Haight, applying the *Feinberg* analysis, found that because of the delay in the criminal trial due process required that they be given a prompt hearing. *See id.* at 34–35. Thus, due process is satisfied when a meaningful opportunity to be heard on the issue of the appropriateness of a suspension is granted within a reasonable time. In this context, this means that a contractor should be afforded the opportunity to demonstrate that the imposition of a suspension would be irrational or contrary to the government's interests.

 The fact that the indictment provides a sufficient justification for the imposition of a suspension does not give rise to a procedural due process violation. First, the fact that an indictment is considered *adequate* evidence to effect a suspension does not mean that the indictment is considered *conclusive* evidence. Rather, the appropriate analogy here—and the essence of the government's position—is one of the indictment giving rise to a rebuttable presumption that a suspension is justified. Because GSA places no limit on the types of evidence a contractor may offer in its submission, a contractor can offer evidence and argument to rebut the indictment; in effect, the contractor can provide evidence sufficient to show that the indictment does not constitute adequate evidence. But, where the contractor does not present compelling contradictory evidence, GSA is entitled to rely on the indictment. Second, grounding a rebuttable presumption upon the indictment does not violate due process, since the indictment itself gives rise to a presumption of probable cause. In *Barry,* the Supreme Court approved the establishment of a presuspension rebuttable presumption of culpability premised upon a trainer's horse testing positive for drugs. *See Barry,* 443 U.S. at 65, 99 S.Ct. at 2649–50. Likewise, in this case, the objective fact of the indictment is sufficiently reliable to provide an adequate basis for the

suspension. *Cf. Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 861–62, 43 L.Ed.2d 54 (1975). Moreover, plaintiffs' argument is unavailing for another reason. If plaintiffs were to make a substantial showing to GSA that there was no supportable basis for imposing a suspension, but GSA nevertheless imposed a suspension, plaintiffs may seek review of the decision in a district court pursuant to the APA. *See Commercial Drapery Contractors, Inc. v. United States,* No. 96–2818, 1997 WL 68203, at *2 (D.D.C. Feb.12, 1997); Tr. at 10.

 Nor does it violate due process that the FAR do not provide for an additional fact finding hearing when the basis for the suspension is an indictment. First, GSA lacks the power to find facts related to the indictment; as the federal defendants note:

> A suspending official cannot make findings of fact relating to an indictment. Neither the suspending official, nor GSA have or can compel access to the evidence presented to the Grand Jury, nor do they have any subpoena power to compel production of production of evidence and the attendance of any witnesses, let alone witness who have accused the contractor.
>
> Indeed, not only are the government's evidence and witnesses not available to GSA, but the suspending official and GSA cannot even compel contractors to appear at any meetings, let alone testify at fact-finding hearings.

Suda Decl. ¶¶ 28–29. Thus, as a practical matter, GSA simply cannot make findings of fact regarding the indictment. Second, there is no need to make fact findings in regard to the indictment. The purpose of the opportunity to be heard is not to contest the indictment, but rather to demonstrate that the suspension should not be imposed, either because it is not in the government's interest to do so, or because in light of the compelling evidence presented by the contractor, a governmental decision to rely only on the indictment would be "arbitrary, capricious, [or] in abuse of discretion" within the meaning of 5 U.S.C. § 706(2)(A). *See Mainelli,* 611 F.Supp. at 614; *Feinberg,* 420 F.Supp. at 118. In this context, due process does not

require a full adversarial hearing and fact finding. *See Feinberg,* 420 F.Supp. at 120 (holding that while notice and oral argument were necessary due process components, a suspension hearing could be limited to the presentation of written evidence). Thus, contractors facing suspension under the FAR receive all the process they are due. As a result, plaintiffs' challenge to the regulations is unlikely to succeed on this ground.

Although not decisive here, it is significant that the notice sent to contractors facing suspension is confusing at best. It states that a contractor may submit information and evidence in opposition to the suspension, but that facts set forth in the indictment are not subject to dispute. *See* Notice of Suspension dated July 24, 1996, Ex. A, Puccio Aff. The recipient of this notice could, quite understandably, think that the indictment was conclusive on the matter, and therefore not avail himself of the opportunity to present evidence that might rebut the indictment. The concept of notice is an empty one if the notice fails to provide meaningful notice. Absent evidence to the contrary, it does not appear that clarification of the contractor's opportunity to be heard would inflict a hardship on GSA. While the burden is on the contractor to present any evidence in opposition, the government should inform—clearly—the contractor that he may do so.

**(c) Impartial Decisionmaker**

Plaintiffs also argue that the regulations are invalid because they do not provide for an impartial decisionmaker. The basis for this claim is the fact that the same suspending official both makes the determination to suspend and considers the contractor's subsequent submissions contesting the suspension. *See* Suda Decl. ¶ 3. In *Goldberg v. Kelly,* the Supreme Court, sketching the process to be afforded a recipient of welfare benefits, noted that "an impartial decision maker is essential." 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (citations omitted). The Court went on to note that while "prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker. [The caseworker] should not, however, have participated in making the determination un-der review." *Id.* The Rutiglianos assert that this requirement is not met here, since the suspending official participates in both the initial and subsequent decision processes. Plaintiffs point out that the suspending official is solely responsible for suspension decisions. This role, they argue, is contrary to the due process conception of an impartial decisionmaker. The federal defendants respond that Suda was not involved in the investigation that resulted in the Rutiglianos' indictment, and in any case, an agency official can perform a combination of functions.

■ These arguments conflate two distinct, but closely related concepts: combination of functions and intra-agency review. The Supreme Court has made it clear that the question of whether independent review is proper should not be confused with whether an agency can perform more than one function. *See Withrow v. Larkin,* 421 U.S. 35, 58 n. 25, 95 S.Ct. 1456, 1469–70 n. 25, 43 L.Ed.2d 712 (1975). Therefore, the Rutiglianos' argument will be considered under each doctrine.

■ Independent review of a decision is proper where multiple levels of review exist within the agency. A clear example of the Supreme Court's application of this concept is found in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), where the Court held that due process concerns were applicable to parole revocation hearings. In discussing the scope of the process due, the Court held that a parolee facing a return to prison was to be afforded a hearing to determine that there were reasonable grounds for the revocation of parole and that this determination should be made by "someone not directly involved in the case." *Morrissey,* 408 U.S. at 485, 92 S.Ct. at 2602. Significantly, the Court characterized this hearing as the second stage of the proceedings; the first was the actual arrest and detention of the parolee. *See id.* The hearing conducted by one other than the parole officer (who could make the initial arrest) was not an initial determination, but rather, a review of the initial detention.

■ Here, however, there is no additional review within GSA; as the Rutiglianos note, the suspending official's decision is final. Therefore, the requirement that an independent official review the decision is simply not applicable in this context, because the regulations do not call for any review. The opportunity to present evidence in opposition is not a review of the decision. Moreover, as the regulations demonstrate, the subsequent proceedings—if any occur—cannot be fairly characterized as a review of an initial decision to suspend. The only reason to hold additional proceedings is in a case where the suspending official determines that there are disputed material facts. If material facts are disputed, the suspending official may assign the case to an ALJ for a hearing to determine these facts. This ALJ is limited to fact finding; the decision to suspend always remains with the suspending official. *See* FAR 9.407–3(d)(2); Suda Decl. ¶¶ 25–26. Thus, the ALJ's role is expressly limited to fact finding and cannot be considered in any sense an independent decisionmaker. Because there is no structure for review of a suspension decision within GSA, there is no need for a neutral decisionmaker to review the decision. Finally, the fact that no such review position exists within GSA is not relevant, because district court review of suspension decisions is available under the APA.

Nor do the cases the Rutiglianos cite support their argument. Plaintiffs have cited *ATL, Inc. v. United States*, 736 F.2d 677 (Fed.Cir.1984), and *Transco Sec., Inc. v. Freeman*, 639 F.2d 318 (6th Cir.1981). In *ATL*, the court found that ATL's suspension had been reviewed by a panel of high ranking Navy officials, but did not reach the validity of the regulation, which did not state whether the person recommending suspension could be the same as the suspending official. *See ATL* at 687. In *Transco*, the Court of Appeals for the Sixth Circuit did not hold that an independent decisionmaker had to review a suspension decision; rather, it held only that in making a decision to suspend, the evidence must be considered by a

"high administrative official within the GSA." *See Transco* at 324. Thus, neither of these cases stands for the proposition that a decision to suspend a contractor must be reviewed within the suspending agency.

■ Alternatively, plaintiffs could be arguing that the regulations permit an unconstitutional combination of functions; plaintiffs assert that in making a suspension decision the suspending official acts as both prosecutor and judge. *See* Pls.' Br. at 23. As the a federal defendants point out, however, the Supreme Court has indicated that a combination of functions within an agency does not constitute a due process violation. In *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the Court held that a statute that gave a state medical board the power to warn, reprimand, suspend and recommend prosecution of physicians did not violate due process. In upholding the statute, the Court reversed a district court that had held that the board's combination of functions prevented it from operating as an impartial decisionmaker. *See id,* at 46, 95 S.Ct. at 1463–64.[5] The Court stated that "[t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication .... must overcome a presumption of honesty and integrity ... [sufficient to show] a risk of actual bias or prejudgment...." *Id.* at 47, 95 S.Ct. at 1464. The Court analogized the agency's functions in making preliminary and subsequent determinations to the functions a judge performs:

> Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pre-trial involvements has been thought to raise any constitutional barrier

---

5. To the extent that plaintiffs' argument is premised on language in *Wasson v. Trowbridge*, 382 F.2d 807, 813 (2d Cir.1967) (noting that "prior official involvement in a case renders impartiality most difficult to maintain" in a subsequent hearing), it must be read in light of the Supreme Court's rejection of this concept in *Withrow.*

against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or preliminary injunction. It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.

*Id.* at 56, 95 S.Ct. at 1469 (footnote omitted)

■ Although the Court did not consider the issue of whether the same administrative official could act in a combination of functions, a recent decision by the Court of Appeals for the Third Circuit held that no due process violation occurred where a single agency official had the power to perform a combination of functions. *See Matter of Seidman,* 37 F.3d 911, 925 (3d Cir.1994) (holding that agency head could authorize an investigation, determine whether charges should be brought, and decide the charges, both as to the law and the facts). The Second Circuit subsequently adopted the *Seidman* rationale in *Cousin v. Office of Thrift Supervision,* 73 F.3d 1242, 1250 (2d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 48, 136 L.Ed.2d 13 (1996). To overcome the presumption of regularity established in *Withrow,* plaintiffs must demonstrate some form of impermissible bias or prejudice on the part of the suspending official. *See Seidman,* 37 F.3d at 925 (*"Withrow* implies ... [that] actual bias or a likelihood of bias must appear if an otherwise valid administrative sanction is to be overturned because of a denial of due process."). The fact that the suspending official may have formed an opinion as a result of the initial investigation is not a cause for bias. *See Withrow,* 421 U.S at 48, 95 S.Ct. at 1464–65 (citing *FTC v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)). Here, plaintiffs have offered no facts to support an inference of bias on the part of the suspending official. As a result, plaintiffs have not demonstrated a likelihood of success on this ground.

### (d) Claims Against the Transit Authority

Plaintiffs have also sought an injunction against the NYCTA and the MTA seeking to enjoin them from awarding any contracts to other carters on the basis of the GSA suspension. Plaintiffs argue that the NYCTA relied on the federal suspension in finding them not responsible, and that this determination must be set aside inasmuch as it rests upon the product of a regulatory scheme that violates due process. The NYCTA argues that it has the discretion to award the contract to the Rutiglianos even if they are suspended by GSA; that it would have made the same determination in the absence of the GSA suspension, and that to the extent that plaintiffs allege that the NYCTA violated their due process rights, the Rutiglianos have received all the process due.

Implicit in the plaintiffs' argument that the NYCTA relied on the GSA suspension in finding them not responsible is the premise that the NYCTA could not make a different determination than GSA because the NYCTA is a recipient of federal money. Currently, the NYCTA receives approximately $30 million dollars from the Federal Transit Administration (this amount comprises less than one percent of the NYCTA's annual operating budget). The NYCTA agrees, as a condition for receiving this money, to abide by the relevant federal regulations, including those concerning suspended contractors. The NYCTA may retain a contractor who has been suspended by the GSA, provided it obtains both a waiver from GSA and approval from the United States Department of Transportation ("DOT"). The NYCTA may also retain the contractor without obtaining a waiver from either agency, but at the risk of forfeiting some or all of its federal funding. *See* Declaration of NYCTA Special Counsel Richard Schoolman attached to NYCTA's Mot.Dis. ("Schoolman Decl.") ¶ 2. Although no information on either the number of or the difficulty of obtaining a waiver from GSA and DOT were provided, it seems reasonable

to conclude that the NYCTA normally has no incentive to ignore a federal suspension.

This conclusion is supported by the correspondence from the NYCTA to the Rutiglianos. In a letter dated December 10, 1996, NYCTA Procurement Specialist Kathie Dickie informed the Rutiglianos that the NYCTA's Procurement Department would recommend that the NYCTA find them not responsible in regard to the bid they had sought. In pertinent part, the letter states that the recommendation is based on "(1) an indefinite GSA suspension ... which would mandate rejection of your bid under applicable federal rules and (2) recent indictments against your firm as issued by The Grand Jury of New York." Ltr. from Dickie to Joseph Rutigliano dated December 10, 1996, Ex. B, Puccio Reply Aff. Subsequently, the Rutiglianos sought review of the responsibility determination by way of a bid protest with the NYCTA. The NYCTA affirmed its determination to find plaintiffs not responsible:

> NYC Transit's determination to find RPS not responsible was based on the solicitation's Federal Contract Provisions which states that a certification process has been established to ensure that entities which have been debarred, suspended, or voluntarily excluded do not participate in a project with FTA assistance.... Since NYC Transit receives funding assistance for its operating budget, ... these Federal Contract provisions apply. As you recognized in our several conversations, NYC Transit is limited in its discretion on this matter. Therefore, NYC Transit's decision to recommend that RPS be deemed non-responsible appears to have been reasonable and in accordance with our funding provisions, and accordingly, your protest is denied.

Ltr. from Assistant Chief Procurement Officer William DeSantis to Craig Eaton, Esq. counsel for plaintiffs dated February 12, 1997, Ex. C, Puccio Reply Aff. The NYCTA argues, however, that it would have made the same determination of non responsibility in any event, and has pointed to several facts in support of its argument, most significantly, the fact of the indictment.

Although it is not entirely clear at this time what the bases of the NYCTA's decision were, it is not necessary to make a determination regarding the validity of the arguments the NYCTA offers in its papers, for under New York law, the NYCTA has the discretion to make its finding on the basis of the indictment alone. *See Schiavone Construction Co. v. Larocca*, 117 A.D.2d 440, 444, 503 N.Y.S.2d 196 (3rd Dep't 1986). The December 10th letter clearly indicates that while the GSA suspension is one factor, the indictment is another. The NYCTA is a creature of statute, and is directed, by statute, to award contracts to the lowest responsible bidder. *See* N.Y.Pub.Auth. Law § 1209(1) (McKinney 1994). New York's courts have noted that an indictment can provide "a rational basis for a determination that [a contractor] is not a responsible bidder." *LaCorte Electrical Const. & Maint., Inc. v. County of Rensselaer*, 80 N.Y.2d 232, 238, 590 N.Y.S.2d 26, 604 N.E.2d 88 (N.Y. 1992) (citing cases). Thus, the NYCTA's determination could rest solely on the indictment.

The fact that the NYCTA may have also relied on the GSA suspension does not give rise to a cognizable federal claim. Assuming, without deciding, that the NYCTA's determination that plaintiffs were not responsible implicates a liberty interest, *see LaCorte*, 80 N.Y.2d at 236, 590 N.Y.S.2d 26, 604 N.E.2d 88, and that the NYCTA's determination was, in some unarticulated fashion, procedurally defective, plaintiffs do no have a cognizable due process injury in this court. The injury to the Rutiglianos is not due to a flaw in the NYCTA's procedures, but rather is the result of an individual, discretionary determination by the agency. Indeed, plaintiffs have failed to articulate any procedural deficiency in the NYCTA's decision making process; their only claim is that the NYCTA may have used the GSA suspension as a basis for its determination that the Rutiglianos were not responsible. As noted above, the NYCTA has the discretion to make a finding that a bidder is not responsible without regard to the federal suspension, and this determination is subject to review only under an arbitrary and capricious standard. *See Mid–State Indus., Ltd. v. City of Cohoes*, 221

A.D.2d 705, 706, 633 N.Y.S.2d 238 (3d Dep't 1995). Here, the fact of the indictment furnishes a sufficient basis for the finding of not responsible. *See LaCorte,* 80 N.Y.2d at 237–38, 590 N.Y.S.2d 26, 604 N.E.2d 88. To the extent that the plaintiffs may have been injured by the NYCTA, any such injury must be the product of a single arbitrary and capricious act—and therefore, the appropriate remedy is an Article 78 proceeding in state court.[6] As the Second Circuit has recently noted, procedural due process violations that flow from unauthorized, random acts, rather than established procedures, do not give rise to cognizable § 1983 claims in federal court where an adequate post-deprivation remedy such as Article 78 exists. *See Hellenic American Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880–82 (2d Cir.1996) (reversing district court's preliminary injunction to enjoin city from debarring community group), *petition for cert. filed,* 65 U.S.L.W. 3755 (U.S. May 1, 1997) (No. 96–1746).

Here, plaintiffs' claim is likewise premised on a procedural due process violation, and so the principle articulated in *Hellenic American* applies with equal force: "there *is no* constitutional violation ... when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty." *Id.* at 882 (citations omitted). Thus, to the extent that the Rutiglianos have suffered or will suffer a cognizable injury at the hands of the NYCTA, their remedy lies with the courts of New York. Therefore, plaintiffs' claims against the NYCTA must fail, and so plaintiffs' motion for a preliminary injunction against the NYCTA and the MTA is denied, and the NYCTA's (and MTA's) cross-motion to dismiss the case as against them is granted.

#### (e) Unfettered Discretion

Plaintiffs also assert that the regulations are unconstitutional because they give the suspending official "unfettered discretion to suspend or not to suspend an indicted contractor." Pls.' Br. at 24. Plaintiffs argue that while the regulations give the suspending official the discretion to decide whether or not to suspend a contractor, they do not provide any guidance in the application of that discretion. In support, they cite to the *Feinberg* decision, which found that § 1818(g) was constitutionally infirm because it did not provide adequate guidance in the application of discretion. *See Feinberg v. FDIC,* 420 F.Supp. 109 117–18 (D.D.C.1976). The federal defendants assert that the regulations do provide the suspending official with sufficient guidance, and that the Supreme Court has upheld similar standards in the *Mallen* case.

Plaintiffs' argument is flawed because the regulations at issue here provide significantly more guidance than those at issue in *Feinberg.* In *Feinberg,* the court found that the only check on a suspending official's discretion was the "general purpose of the statute: to insure the public's confidence in the stability of the financial institution." *Feinberg,* 420 F.Supp. at 117. No direction was given to the agency as to how to make that determination. This lack of guidance, coupled with the seriousness and potential duration of the deprivation, led the court to hold the statute unconstitutional. *See id.* at 118.

█ In contrast, the regulations challenged here do provide direction for determining when suspension is appropriate, and how that decision should be made. Suspension is in furtherance of the policy that agencies shall contract only with responsible contractors. *See* FAR 9.402. Suspension is to be imposed only when the suspending official determines that it would be in the government's interest to impose it. *See id.* Suspension is in the government's interest when it is made for one of the causes enumerated in 9.407–2.[7] Thus, contractors are to be sus-

---

6. Plaintiffs have not asserted that the NYCTA has suspended them, only that it improperly determined that the Rutiglianos were not responsible. As at least one New York court has noted, the question of whether an agency can impose a suspension is distinct from the question of whether a finding of not responsible was arbitrary and capricious. *See Callanan Ind., Inc. v. White,* 118 A.D.2d 167, 170–71, 503 N.Y.S.2d 930 (3d Dep't 1986).

7. *See* FAR 9.407–2, *supra.*

pended only when the suspending official determines that cause for suspension exist.

As to the determination of whether to suspend an individual contractor, the regulations provide that when considering whether suspension for one of the enumerated causes is appropriate, the suspending official is to consider the evidence against the contractor and its reliability.[8] Furthermore, the suspending official is directed to consider the gravity of the alleged offense. *See* FAR 407–1(b)(2). These directions provide significantly more guidance than the statute at issue in *Feinberg.* As the *Feinberg* court noted, the statute (§ 1818(g)) provided no guidance for the application of the agency's discretion. This is simply not the case with the FAR, which provide a suspending official with a specific standard to consider suspension (for one of the enumerated causes), and, additionally, direct the official to determine the appropriateness of a suspension in light of the government's interests, the weight to be accorded the evidence, and any mitigating or rebuttal evidence proffered by the contractor.

It is also significant that, unlike the statute at issue in *Feinberg,* the FAR permit a contractor to present *any* evidence to show that the suspension would not be in the government's interest; a critical difference, since the *Feinberg* court identified one of the sources of uncontrolled discretion as the fact that a person facing suspension had no opportunity to present exculpatory or mitigating evidence. *See Feinberg,* 420 F.Supp. at 117 n. 15. It is true that the FAR also state that the suspending official need not consider any exculpatory evidence. *See* FAR 407–1(b)(2). If this provision were strictly applied, it might well raise serious constitutional concerns. *See Feinberg,* 420 F.Supp. at 117–18. Here, however, the federal defendants have indicated that they would, in fact, consider any form of credible exculpatory evidence. *See* Suda Decl. ¶ 15; Tr. at 4.

Plaintiffs correctly observe that in its *Mallen* opinion the Supreme Court did not expressly consider the constitutionality of the regulation revised after the *Feinberg* decision. In its recital of the factual background, the Court discussed the *Feinberg* court's con-

cern with the standardless discretion under the old version of the statute, and then went on to note that Congress had since provided the agency with more guidance. The Court did not actually consider whether the statute provided sufficient control of agency discretion; however, it appears from the discussion that the Court did, in fact, think that sufficient control over the agency's discretion was established. *See FDIC v. Mallen,* 486 U.S. 230, 235–36, 108 S.Ct. 1780, 1785–86, 100 L.Ed.2d 265 (1988). A comparison of the pre- and post-*Feinber* statutory language of § 1818(g) is relevant here, in light of the discussion in *Mallen,* because the language quoted by the Supreme Court in its *Mallen* opinion is, by implication, illustrative of a standard that provides sufficient guidance to the agency. Prior to *Feinberg,* § 1818(g)(1) provided in part that

> Whenever any director or officer of an insured bank ... is charged in any information, indictment, or complaint ... with the commission of or participation in a felony involving dishonesty or breach of trust, the appropriate Federal banking agency may, by written notice ... suspend him from office....

*Mallen,* 486 U.S. at 233 n. 3, 108 S.Ct. at 1784 n. 3. The revised version provides:

> Whenever an director or officer of an insured bank ... is charged in any information, indictment, or complaint ... with the commission of or participation in *a crime* involving dishonesty or breach of trust *which is punishable by imprisonment for a term exceeding one year under State or Federal law,* the appropriate Federal banking agency may, *if continued service or participation by the individual may pose a threat to the interests of the bank's depositors or may threaten to impair public confidence in the bank,* by written notice ... suspend him from office....

*Id.* at 236 n. 5, 108 S.Ct. at 1785 n. 5 (emphasis in original). The older version of the statute does not provide *any* standard by which the agency should decide to impose a suspension. In contrast, the revised statute provides a standard for the agency to make a

---

8. *See* FAR 9.407–1(b)(1), *supra.*

determination before imposing suspension. In this case, it is clear that the FAR provide significantly more guidance than the revised standard cited in *Mallen*. The regulations provide guidance both in determining when suspension should be imposed, and how to make that determination. A suspended contractor may present exculpatory or mitigating evidence, and argue that suspension would not be in the government's interest—thus having an opportunity to directly discuss the proper application of the agency's discretion. Thus, the contention that the agency's discretion is standardless is without foundation.

Nor do the cases cited by the Rutiglianos support their position. In *Lindemann v. American Horse Shows Ass'n, Inc.*, 164 Misc.2d 937, 624 N.Y.S.2d 723 (Sup.Ct. N.Y.Cty.1994), the court vacated a suspension imposed by a private association that essentially barred the plaintiff from his field of employment, finding that the association's hearing procedures had violated the plaintiff's due process rights. As in *Feinberg*, there was no standard to guide the committee that determined the suspension at issue. *See Lindemann*, 164 Misc.2d at 947, 624 N.Y.S.2d 723. The court found that because the committee had refused to consider any evidence other than the indictment, "the exercise of responsible discretion was wholly illusory in its application." *Id.* at 953, 624 N.Y.S.2d 723. In contrast, the FAR provide detailed guidance to the suspending official, and the plaintiffs do have the opportunity to present exculpatory evidence. The other cases plaintiffs cite simply do not discuss the issue of discretion; insofar as they may be relevant to this issue, they could be held to say that a contractor facing suspension has the right to protest. Thus, there is little likelihood of success on this ground.

### (f) Duration of Suspension

 Plaintiffs also contend that the FAR are unconstitutional as applied. The basis of the claim is the delay in the trial on the charges alleged in the indictment. Plaintiffs have made several attempts to secure a prompt trial, all without success. Plaintiffs argue that they should not be left hanging in suspension until the conclusion of the crimi-nal trial, especially where, as here, they have sought a speedy trial. If an indictment did constitute significant criminal proceedings within the meaning of FAR 9.407–4(c), and if suspension was premised solely upon an uncontrovertible indictment, then the fact that an indicted contractor—despite its own efforts to obtain a trial—could be faced with an indefinite suspension, might well be an effective denial of due process. *See FDIC v. Mallen*, 486 U.S. 230, 242, 108 S.Ct. 1780, 1788–89, 100 L.Ed.2d 265 (1988) (outlining factors to consider in determining whether a post-suspension delay is appropriate); *Angelilli v. Murphy*, No. 79 Civ. 5983, slip op. at 31 (S.D.N.Y. Dec. 28, 1979) (holding that suspension pending criminal trial violates due process "where the potential delay ... is measured in years, not months."). This is not, however, the situation here. GSA has represented that while it may impose a suspension upon the issuance of an indictment, it does not consider an indictment a criminal proceeding. *See* Tr. at 3. Therefore plaintiffs' suspension will end in July 1997, absent the commencement of the trial, a request by the government for a six month extension, or some other substantive activity in the case. *See id.* GSA has also represented that the motions plaintiffs have made to obtain a speedy trial are not significant acts that would toll the twelve month period. *See id.* at 13. Because there is no significant activity in the state criminal case that would prolong the suspension at this time, there is no need to decide whether a GSA determination that a significant legal proceeding has occurred would result in a due process violation. Nevertheless, it should be noted that the absence in the FAR of any clear guide as to what constitutes significant legal activity is troubling, and could, under a different set of facts, give rise to a cognizable due process claim.

### Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction against all defendants is denied, upon the ground that they have not demonstrated a likelihood of success on the merits. Furthermore, the cross-motion of defendants NYCTA and

MTA to dismiss the case against them is granted for failure to state a claim against them. With respect to the federal defendants: as they stated at oral argument, plaintiffs are still free to request an opportunity to be heard before GSA prior to the expiration a their suspension, and may present any exculpatory evidence they wish.