[No. B183344. Second Dist., Div. Three. July 28, 2006.]

AMERICAN LIBERTY BAIL BONDS, INC., Plaintiff and Respondent, v. JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Defendants and Appellants.
ADNAN MUSTAFA YOUSEF, Plaintiff and Appellant, v. JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Defendants and Respondents.

1048

COUNSEL

Bill Lockyer, Attorney General, W. Dean Freeman, Mark P. Richelson and Brian D. Wesley, Deputy Attorneys General, for Defendants and Appellants and for Defendants and Respondents.

Barger & Wolen, Robert W. Hogeboom, Robert J. Cerny and Suh Choi for Plaintiff and Appellant and for Plaintiff and Respondent.

OPINION

ALDRICH, J.—

## INTRODUCTION

Adnan Mustafa Yousef and his company, American Liberty Bail Bonds, Inc. (American Liberty), are licensed bail agents. In 2004, the Orange County District Attorney filed a felony complaint charging them with various crimes relating to their bail bond business. Based on that felony complaint, California's Insurance Commissioner, John Garamendi, and the California Department of Insurance (collectively the Commissioner), suspended Yousef and American Liberty from "participating in the business of an insurer or production agency." The Commissioner issued the suspension order under Insurance Code section 1748.5, subdivision (e)(1), which provides that if a "subject person" has been charged with certain types of crimes and if the Commissioner finds that a failure to issue a suspension order threatens an insurer's solvency or may cause financial or other injury to any person, then the Commissioner shall immediately suspend that subject person from participating in the business of an insurer or production agency. Section 1748.5, subdivision (e)(1), neither gives a subject person the right to a presuspension hearing nor were Yousef and American Liberty given a presuspension hearing.

Yousef filed a petition for writ of mandate in the superior court claiming, among other things, that the failure of Insurance Code section 1748.5, subdivision (e)(1), to provide a presuspension hearing violates due process and that the postsuspension hearing that is provided under that section also violates due process. American Liberty filed a petition for writ of mandate that also raised these due process arguments, as well as the argument that section 1748.5, subdivision (e)(1), applies only to natural persons, and not to entities such as corporations. The superior court rejected Yousef's due process arguments, but agreed with American Liberty that the statute applies only to natural persons.

No appellate court has interpreted Insurance Code section 1748.5, subdivision (e)(1). Relying, however, in part on United States Supreme Court authority, we conclude that the Commissioner did not violate Yousef's due process rights in suspending his license under section 1748.5, subdivision (e)(1). Relying on the plain language of the section and its legislative history, we also conclude that the section applies only to natural persons. We therefore affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *The Commissioner issues an order of immediate suspension.*

American Liberty is licensed by the Department of Insurance to act as a bail agent. Yousef, who also was a licensed bail agent, is American Liberty's sole shareholder. American Liberty employs about 25 people and has more than 15 offices in Southern California. In 2003, it produced about $180 million in gross bail.

On September 14, 2004, the Orange County District Attorney filed a felony criminal complaint naming, among others, American Liberty and Yousef as defendants. An amended felony complaint charged them with violations of the Penal and Insurance Codes, namely, conspiracy to commit a kidnapping, kidnapping for extortion, conspiracy to commit unlawful bail solicitation, 20 counts of undertaking bail without a license, conspiracy to commit grand theft, conspiracy to knowingly commit performing a notarial act on a false or forged trust deed, conspiracy to falsify a trust deed, conspiracy to make, alter or pass documents, grand theft, and conspiracy to commit embezzlement. All counts arose out of American Liberty and Yousef's bail bond business. For example, the complaint alleged that a bail bond had been posted for a man who then refused to sign a bail bond agreement and to pay fees. Yousef participated in a scheme to abduct the man from his home, to transport him to American Liberty's offices, and to force him to sign a bail bond agreement. The complaint also alleged that Yousef employed unlicensed bail agents and that he forged a trust deed document to secure a lien against property without the property owner's knowledge or consent.

Soon after the felony criminal complaint was filed, the Commissioner, on September 23, 2004, issued an order of immediate suspension under Insurance Code[1] section 1748.5, subdivision (e)(1) (hereafter section 1748.5(e)(1)). The order stated, "[B]ased on the matters set forth herein, Respondents . . . have been charged in a felony complaint, . . . the Felony Complaint alleges misconduct committed in Respondents' capacity as licensed production

---

[1] All further undesignated statutory references are to the Insurance Code.

agents, and, [¶] . . . based upon the foregoing, the Commissioner . . . finds that failure to immediately issue this Order may cause present and future financial or other injury to any person within the meaning of Insurance Code section 1748.5(e)(1)(B)." American Liberty and Yousef were therefore immediately suspended from "EMPLOYMENT WITH ANY PRODUCTION AGENCY OR PARTICIPATION IN ANY MANNER IN THE CONDUCT OF THE BUSINESS OF AN INSURER OR ANY INSURANCE PRODUCTION AGENCY, INCLUDING BAIL BOND AGENC[IES], EXCEPT WITH THE PRIOR CONSENT OF THE INSURANCE COMMISSIONER." The order also notified American Liberty and Yousef that within 30 days after the order was issued they could file an application for a hearing on the order, which hearing would be scheduled within 15 days after the application was filed.[2]

## II. *The petitions for writ of mandate.*

Instead of applying for a hearing on the order, American Liberty and Yousef filed petitions for writ of mandate[3] under California Code of Civil Procedure section 1085. They argued that section 1748.5(e)(1) violates due process because it permits subject persons to be immediately suspended without a predeprivation hearing, the suspension may be based solely on the filing of a criminal complaint, the postdeprivation hearing is illusory, and the section is vague and overbroad. American Liberty also argued that section 1748.5(e)(1) applies to individuals and not to corporations. After full briefing on the petitions, the trial court denied Yousef's petition, but granted American Liberty's petition. The trial court found that section 1748.5(e)(1) does not violate due process, but that "subject person" as used in section 1748.5 means a natural person and excludes corporations such as American Liberty.[4]

The trial court issued the judgments. Thereafter, the Commissioner filed a timely appeal from the judgment in American Liberty's favor, and Yousef filed a timely appeal from the judgment against him.

---

[2] The trial court issued a stay of the immediate order of suspension as to American Liberty on certain conditions.

[3] American Liberty filed two petitions for mandate. American Liberty's first petition argued it was not a "subject person" under the statute, and its second petition made due process arguments. Yousef filed a separate petition for writ of mandate. The trial court consolidated all petitions.

[4] Because the trial court found that section 1748.5 does not apply to corporations, it did not consider whether American Liberty's due process rights were violated.

## DISCUSSION

### I. *Standard of review.*

■ Code of Civil Procedure section 1085, subdivision (a), states: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right . . . ." Mandamus will lie to compel an official both to exercise his or her discretion, if he or she is required by law to do so, and to exercise it under a proper interpretation of the applicable law. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) To be entitled to relief, a petitioner must show that the respondent has a clear, present, and ministerial duty to perform an act in obedience to the mandate of legal authority and that the petitioner has a clear, present, and beneficial right to performance of that duty entitling it to a writ of mandate. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].) Where, as here, the trial court's decision on a petition for writ of mandate did not turn on disputed facts, the trial court's legal interpretation of the Insurance Code is subject to de novo review. (*Ibid.*)

### II. *A corporation is not a "subject person" under section 1748.5(e)(1).*

The trial court, when it granted American Liberty's petition for writ of mandate, found that the definition of "subject person" in section 1748.5 refers only to individuals, and not to entities like American Liberty. Rules of statutory construction and legislative history compel us to agree.

■ Our task in construing a statute is to ascertain and effectuate the legislative intent. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) We first look at the words themselves because they are the most reliable indicator of legislative intent. (*Ibid.*) We give the words of a statute their ordinary and usual meaning and construe them in the context of the statute as a whole. (*Ibid.*) If the plain language of the statute is unambiguous and does not involve an absurdity, the plain meaning governs. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1172 [124 Cal.Rptr.2d 464, 52 P.3d 648].) We examine statutory language in the context of the statutory framework as a whole in order to determine the scope and purpose of a particular statute and harmonize it with the various parts of the statutory scheme. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy. (*Ibid.*;

*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

The statute at issue, section 1748.5(e)(1), provides: "If the commissioner finds both of the following, he or she shall immediately issue an order suspending a *subject person* from his or her office or employment with a production agency and prohibiting the subject person from participating in any manner in the conduct of the business of an insurer or production agency, except with the prior consent of the Commissioner: (A) the subject person has been charged in an indictment issued by a grand jury, or in an information, complaint, or similar pleading issued by a United States Attorney, district attorney, or other governmental official or agency authorized to prosecute crimes, with a crime punishable by imprisonment for a term exceeding one year and which involves as one of its necessary elements a fraudulent act or an act of dishonesty in the acceptance, custody, or payment of money or property; and (B) that a failure to immediately issue the order threatens the financial solvency of an insurer or may cause financial or other injury to any person. [¶] In the event the criminal proceedings are terminated other than by judgment of conviction, an order issued pursuant to paragraph (1) of this subdivision shall be deemed rescinded as if it had not been issued." (§ 1748.5(e)(1), italics added.)[5]

■ Section 1748.5(e)(1) thus allows the Commissioner to suspend a "subject person." A "subject person" is "any person who has participated or may participate in any manner in the business of a production agency, or any person licensed as a producer." (§ 1748.5, subd. (a)(2).) Focusing on the last part of that definition—"any person licensed as a producer"—the Commissioner argues that because American Liberty is licensed as a producer, it is a subject person. It buttresses that argument by pointing to section 19, which generally defines "person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation." (§ 19.) That general provision governs construction of the code, "[u]nless the context otherwise requires . . . ." (§ 5.)

■ Here, the context "otherwise requires" us not to rely on the general definition of "person" in section 19. Section 1748.5(e)(1) states that the Commissioner may suspend a subject person "from his or her office or employment *with a production agency*" and may prohibit "the subject person *from participating in any manner in the conduct of the business of an insurer or production agency*." (§ 1748.5(e)(1), italics added.) Only a natural person can be suspended from office or employment with a production agency; a production agency cannot be suspended from office or employment with itself

---

[5] Section 1748.5 is set forth in its entirety in the appendix to this opinion.

or another entity. Similarly, a natural person can be suspended from participating in an insurer's or production agency's business; a production agency cannot be suspended from participating with itself in the conduct of its business. Thus, "subject person" must refer only to individuals, otherwise the subdivision does not make sense.

Reading section 1748.5(e)(1) in the context of the statute as a whole also supports this interpretation that a "subject person" is separate and distinct from an entity such as a production agency. For example, subdivision (h)(1) states it is unlawful for a subject person against whom a suspension order has been issued to "serve or act as a subject person for any insurer or production agency" or to "directly or indirectly vote any shares or other securities of an insurer or production agency." (§ 1748.5, subd. (h)(1)(A), (B).) The common-sense reading of subdivision (h)(1) is that it precludes a subject *natural* person from participating in an entity acting as a production agency. Also, subdivision (h)(3) permits the Commissioner to assess a penalty against a "production agency [that] has knowingly aided and abetted a subject person." (§ 1748.5, subd. (h)(3).) Again, the commonsense reading of subdivision (h)(3) is a penalty can be assessed against a production agency that aids and abets a *natural* person, because a production agency cannot aid and abet a production agency.[6] That is, the statute's juxtaposition of "subject person" and production agency means that the two phrases cannot mean the same thing.

Section 1748.5's legislative history, although it does not expressly address whether the statute applies only to natural persons, nonetheless also supports interpreting the statute to exclude entities such as corporations. Senate Bill No. 389 was enacted in 1991 to, among other things, add section 1748.5 to the Insurance Code.[7] It was enacted in response to the insolvency of several insurance companies, which "left an $80 million loss that was paid by

---

[6] Subdivision (a)(1) of section 1748.5 provides that a "production agency" is "any person or organization licensed under Chapter 5 (commencing with Section 1621), Chapter 5A (commencing with Section 1759), Chapter 6 (commencing with Section 1760), Chapter 7 (commencing with Section 1800), or Chapter 8 (commencing with Section 1831)." (§ 1748.5, subd. (a)(1).) Because this definition refers to "any person *or organization*" but the definition of "subject person" omits the word "organization," American Liberty reasons that corporations are excluded from the ambit of section 1748.5. But we do not believe that the statute's use of the word "organization" to define a production agency is particularly helpful in determining whether "subject person" includes corporations. It is more likely, as the Commissioner suggests, that the word "organization" was specifically used in section 1748.5, subdivision (a)(1), to refer to "organizational licenses." (See, e.g., §§ 1627, 1628 & 1842.1.)

[7] Assembly Bill No. 3831, which died in the Assembly, was the precursor to Senate Bill No. 389. Assembly Bill No. 3831 was designed "to permit the Insurance Commissioner to suspend or remove officers, directors or employees of domiciled insurance companies and production agencies for improper or illegal acts." (Sen. Patrick Johnston, author's statement, Assem. Bill No. 3831 (1990–1991 Reg. Sess.).)

California automobile policyholders through CIGA surcharges on their automobile policies." (Sen. Com. on Ins., Claims & Corp., Analysis of Sen. Bill No. 389 (1991–1992 Reg. Sess.) as amended May 8, 1991, p. 3.) Incompetent management and fraudulent sales practices contributed to the insolvency. (*Ibid.*) "Those individuals who engaged in such acts continued their insurance careers by going to other insurance companies. . . . [¶] . . . [¶] This is a very important bill which will plug existing gaps in the law that now permit law breakers and those engaging in willful acts of dishonesty that imperil the solvency of an insurer from continuing on in an industry that holds other people's money." (Sen. Patrick Johnston, letter to Governor Pete Wilson, Sept. 17, 1991.)[8]

In support of the bill, the Commissioner wrote, "The purpose of this bill is to empower the Insurance Commissioner to remove from the insurance industry those 'bad actors' who cause the public serious harm. . . . We have seen the same players move from the wreckage of one insurer or producer to wreak new havoc on other insurers and their policyholders. This bill would enable the Insurance Commissioner to protect consumers from those individuals who, by their repeated conduct, have shown that they have no place in the insurance business. [¶] My existing authority over licenses and certificates of authority is, unfortunately, inadequate in many circumstances. There is a tremendous range of activities within the insurance industry which does not require personal licensure. And it makes little sense to revoke the certificate of authority of an insurer, with the related fallout on policyholders and others, including shareholders and employees, when the 'surgical removal' of the bad apple can resolve the problem." (Ins. Comr. John Garamendi, letter to Assem. Jud. Com. Chair Phillip Isenberg, Aug. 21, 1991.)

Senate Bill No. 389 was amended six times. Section 1748.5 was not added until the fifth amendment in the Assembly on September 5, 1991.[9] As first added to the bill, the section defined "subject person" as "any director, officer

---

[8] Senate Bill No. 389 was modeled after Financial Code section 1913.5. That section defines "subject persons" as follows: " 'Subject person of a bank' means any director, officer, or employee of the bank, or any person who participates in the conduct of the business of the bank. However, 'subject person of a bank' does not include a controlling person of the bank that is registered as a bank holding company with the Board of Governors of the Federal Reserve System pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. Sections 1841, et seq.). 'Subject person of a bank' does not include an individual who is a director, officer, or employee of a controlling person of the bank unless the individual is a director, officer, or employee of the bank or participates in the conduct of the business of the bank. . . ." (Fin. Code, § 1913.5, subd. (a)(4).)

[9] Until that time Senate Bill No. 389 concerned, among other things, adding section 728 to the Insurance Code. Subdivision (a)(1) of section 728 defines "subject person" as "any director, officer, or employee or other natural person who participates in the management, direction, or control of an insurer."

or employee of a production agency, or any natural person who participates in the management or control of the business of a production agency. A subject person of a production agency participates in the control of a production agency if he or she comes within the definition of 'controlling person' as specified in subdivision (b) of Section 1668.5." (Assem. Amend. to Sen. Bill No. 389 (1991–1992 Reg. Sess.) Sept. 5, 1991.) Therefore, in its first incarnation, a subject person was clearly a natural person.

But section 1748.5 was again amended in Assembly to define a "subject person" as "any director, officer or employee of a production agency, any natural person who participates in the management or control of the business of a production agency, *or any person licensed as a producer. A* subject person of a production agency participates in the control of a production agency if he or she comes within the definition of 'controlling person' as specified in subdivision (b) of Section 1668.5." (Assem. Amend. to Sen. Bill No. 389 (1991–1992 Reg. Sess.) Sept. 10, 1991, italics added.) This definition of "subject person" was passed.

To support its expansive interpretation of the statute, the Commissioner focuses on the highlighted language and the omission of the word "natural" before any "person licensed as a producer." Based on that omission, the Commissioner argues that "person" encompasses a corporation under the general definition set forth in section 19.

There are at least two reasons why this argument is not persuasive. First, the addition of the italicized language was described as merely a "technical amendment" "that specifies that persons subject to discipline working for production agencies include those persons 'licensed as producers.' " (Sen. Patrick Johnston, sponsor's statement, Sen. Bill No. 389 (1991–1992 Reg. Sess.).) Thus, the addition only clarified that licensed and unlicensed persons are subject to section 1748.5. The additional language was not intended to broaden the definition of "subject person" to include entities. Second, at the time section 1748.5 was added in 1991, only natural persons could become producers. (Former § 1810.) It was not until 1996 that corporations, under certain conditions, also could be licensed. (§ 1810, subd. (b).) Therefore, as originally enacted "subject person" included only natural persons.

After its enactment in 1991, section 1748.5 was amended by Senate Bill No. 941 in 1999. The amendment removed the reference to "natural person." Specifically, Senate Bill No. 941 proposed amending the definition of

"subject person" to mean "any person who has participated or may participate in any manner in the business of a production agency, or any person licensed as a producer." Other than a letter from a senior legislative counsel to the bill's author, Senator Jackie Speier, requesting that section 1748.5 be "strengthened" by, among other things, "[b]roadening the definition of 'subject person' to any 'person who has participated or may participate, in any manner' in a production agency," there is no discussion of the amendment in Senate Bill No. 941's legislative history. The absence of such a discussion suggests that the 1996 amendment was merely a technical one, and not one to make the section more expansive by including corporations.

■ We therefore conclude, based on this legislative history and the face of section 1748.5, that corporations, such as American Liberty, may not be suspended under that statute. Our conclusion that the Commissioner may not suspend American Liberty under section 1748.5(e)(1), however, does not leave the Commissioner without recourse. The Commissioner may pursue action against American Liberty's license under section 1807.5, which provides for a suspension of a license after a hearing and notice and for a temporary 15-day suspension.[10]

III. *The failure of section 1748.5(e)(1) to provide a predeprivation hearing does not violate due process.*

■ Due process of law is required before a state may deprive a person of life, liberty or property. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.)[11] The process that is due under any given circumstance may include a hearing before a person is deprived of such interests. But here the Commissioner suspended Yousef from participating in a production agency without first affording him a hearing, and, moreover, the Commissioner based that suspension on the fact that a criminal complaint had been filed naming Yousef as a defendant. ■ Section 1748.5(e)(1), however, permits the Commissioner to immediately suspend a subject person if the person has been charged with a certain type of crime. And neither a suspension that is based on a criminal charge nor one that occurs without a predeprivation hearing offends due process.

---

[10] American Liberty has also argued that, for the purposes of due process, suspending the license of a corporation is substantively different than suspending a natural person's license. We need not reach this argument based on our conclusion that American Liberty cannot be suspended under section 1748.5(e)(1).

[11] The due process clauses under the federal and state Constitutions are considered to be co-extensive and to have the same scope and purpose. (*Sandrini Brothers v. Voss* (1992) 7 Cal.App.4th 1398, 1405, fn. 2 [9 Cal.Rptr.2d 763].)

■ Rather, to answer the question what process is due before a person can be deprived of property,[12] we balance the following factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest . . . ." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893]; see also *People v. Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622] ["[I]identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"].)

■ Using the *Mathews v. Eldridge* balancing test, the United States Supreme Court has found that a person is not always entitled to a hearing before being deprived of a property interest. (See, e.g., *Gilbert v. Homar* (1997) 520 U.S. 924, 930–931 [138 L.Ed.2d 120, 117 S.Ct. 1807] (*Gilbert*); *FDIC v. Mallen* (1988) 486 U.S. 230, 240–241 [100 L.Ed.2d 265, 108 S.Ct. 1780] (*Mallen*); *Barry v. Barchi* (1979) 443 U.S. 55, 64 [61 L.Ed.2d 365, 99 S.Ct. 2642] (*Barry*).) Rather, " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' [Citation.]" (*Gilbert, supra,* at p. 930.)

For example, in *Mallen, supra,* 486 U.S. 230, a bank's president was suspended under former title 12 United States Code section 1818(g)(1). Section 1818(g)(1), like section 1748.5(e)(1), provided that whenever "any director or officer of an insured bank, or other person participating in the conduct of the affairs of such bank, is charged in any information, indictment, or complaint authorized by a United States attorney, with the commission of or participation in a crime involving dishonesty or breach of trust which is punishable by imprisonment for a term exceeding one year under State or Federal law, the appropriate Federal banking agency may, if continued service or participation by the individual may pose a threat to the interests of the bank's depositors or may threaten to impair public confidence in the bank, by written notice . . . suspend him from office or prohibit him from further

---

[12] The parties do not dispute that Yousef had a property interest and was entitled to due process.

participation in any manner in the conduct of the affairs of the bank." (*Mallen, supra,* at pp. 234–235, fn. 5, italics omitted.)[13]

The Federal Deposit Insurance Corporation (FDIC) suspended Mallen under former title 12 United States Code section 1818(g)(1) without first affording him a predeprivation hearing. Although Mallen did not contend he was entitled to a predepriviation hearing, the court noted that "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation. [Citations.]" (*Mallen, supra,* 486 U.S. at p. 240.) The court thus first found that there was an important government interest at issue. Namely, Congress had found that prompt suspension of bank officers might be necessary to protect depositors and to maintain public confidence in banking institutions. (*Id.* at pp. 240–241.) Second, the indictment against Mallen established "that an independent body has determined that there is probable cause to believe that the [person] has committed a crime" described under section 1818(g)(1). (*Mallen, supra,* at p. 244.) The indictment, "coupled with the congressional finding that a prompt suspension is important to the integrity of our banking institutions," thus supported the issuance of the suspension order without a predeprivation hearing. (*Id.* at p. 241; see also *Gilbert, supra,* 520 U.S. at p. 930 ["This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause"].)

Here too there is an important government interest at stake that is accompanied by a substantial assurance the deprivation is warranted. The state's interest, which prompted the enactment of section 1748.5(e)(1), is premised on a legislative finding that the Commissioner needs tools to immediately suspend persons against whom certain types of criminal charges have been filed. Such persons, our Legislature has found, may threaten the financial solvency of insurers or cause financial or other injury to people.

---

[13] Title 12 United States Code section 1818(g)(1)(A) now provides, "Whenever any institution-affiliated party is charged in any information, indictment, or complaint, with the commission of or participation in—

"(i) a crime involving dishonesty or breach of trust which is punishable by imprisonment for a term exceeding one year under State or Federal law, or

"(ii) a criminal violation of section 1956, 1957, or 1960 of title 18 or section 5322 or 5324 of title 31,

"the appropriate Federal banking agency may, if continued service or participation by such party may pose a threat to the interests of the depository institution's depositors or may threaten to impair public confidence in the depository institution, by written notice served upon such party, suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of the depository institution."

Preserving the insurance industry, and hence the public's confidence in that industry, is the governmental interest underlying section 1748.5(e)(1).

Thus, although there is no doubt that Yousef has a private interest in his bail agent license and in his ability to participate in his bail bond business (see, e.g., *Barry, supra,* 443 U.S. at p. 64; *Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39 [124 Cal.Rptr.2d 701, 53 P.3d 119] [" 'The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection' [citation]"), that private interest is counterbalanced by the state's interest. Given that our Legislature has made findings concerning how to maintain the integrity of the insurance industry, substantial justification exists to suspend subject persons, like Yousef, without a predeprivation hearing where they have been charged in an information with a crime described in section 1748.5, subdivision (e)(1)(A).[14]

That the suspension in *Mallen* was based on an indictment whereas Yousef's suspension is based on an information does not render the risk here of erroneous deprivation any greater than the risk in *Mallen.* In *Gilbert, supra,* 520 U.S. 924, the court held that a university police officer could be suspended without a presuspension hearing when he had been arrested and formally charged with a felony. The court said, "It is true . . . that there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged; but for present purposes arrest and charge give reason enough. They serve to assure that the state employer's decision to suspend the employee is not 'baseless or unwarranted,' [citation], in that an independent third party has determined that there is probable cause to believe the employee committed a serious crime." (*Id.* at p. 934; see also *id.* at p. 932 ["the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility . . ."].)

Here, the Orange County District Attorney filed an information against Yousef. That information was filed by a body independent from the Commissioner, and it had to be based on reasonable or probable cause or it was subject to being set aside. (See Pen. Code, § 995.) Therefore, the information, like an indictment, provides "adequate assurances" that the suspension is not unjustified. (*Gilbert, supra,* 520 U.S. at p. 934.)

Moreover, under *Mallen* and *Gilbert,* we do not see a problem with permitting an information to constitute evidence that a failure to immediately

---

[14] Yousef argues that *Mallen* is distinguishable because it involved an employee whereas this case involves a licensee. We do not see this as a relevant distinction in this context.

issue a suspension order would threaten the financial solvency of an insurer or may cause financial or other injury to any person. (§ 1748.5, subd. (e)(1)(B).) Yousef argues, to the contrary, that section 1748.5(e)(1) requires two *separate* findings: (A) the subject person has been charged with a crime punishable by imprisonment for one year or more and which involves as one of its necessary elements a fraudulent act or an act of dishonesty involving money *and* (B) a failure to immediately issue the order threatens an insurer's financial solvency or may cause financial or other injury to any person. The charging instrument may not, argues Yousef, be used as evidence to support the second finding of a threat or injury.

The court in *Mallen, supra,* 486 U.S. at page 241, however, rejected a similar argument. Former title 12 United States Code section 1818(g) required the FDIC to make two findings: first, the individual had been charged with a specific type of crime and, second, the individual posed a threat to the bank's depositors or to public confidence in the bank. The court impliedly found that the indictment alone evidenced the threat.[15] The court noted that an indictment establishes probable cause that the individual has committed the crime, and therefore the indictment "should certainly be sufficient, when coupled with the congressional finding that a prompt suspension is important to the integrity of our banking institutions, to support the order entered in this case . . . ." (486 U.S. at p. 241.)

Section 1748.5(e)(1) similarly permits the Commissioner to conflate the findings required under section 1748.5, subdivision (e)(1)(A) and (B). Nor do we believe that this is improper where the Legislature has determined that the integrity of the insurance industry may be threatened by the continued participation in that industry of subject persons against whom specific types of criminal charges have been filed. Such filings are generally a matter of public record, and may therefore have an immediate impact on public confidence in the insurance industry. An immediate response, where certain limited circumstances are present, our Legislature has found, therefore may be necessary.[16]

Notwithstanding that *Mallen* and *Gilbert* control the outcome here, Yousef cites *Gray v. Superior Court* (2005) 125 Cal.App.4th 629 [23 Cal.Rptr.3d 50] (*Gray*), to support his contentions he should have been given a presuspension

---

[15] The court in *Mallen* did not recite the order of suspension. It merely stated that the FDIC issued an order containing the necessary findings. (*Mallen, supra,* 486 U.S. at p. 238.)

[16] If section 1748.5(e)(1) allowed a subject person to be suspended based on the filing of any type of criminal complaint—for example, a complaint based on a sex offense—we might agree it is improper to make a positive finding on the second prong of section 1748.5(e)(1). But section 1748.5(e)(1) safeguards against this by specifying that only crimes involving as an element a fraudulent act or an act of dishonesty involving money provide a basis for suspension. It is only those types of crimes that pose a threat to the public under the statute.

hearing and that the mere filing of a criminal complaint does not provide a sufficient basis to suspend him. Gray, a licensed doctor, was charged with, among other things, unlawfully prescribing and possessing a controlled substance, misdemeanor possession of child pornography, and sexually exploiting a patient or former patient. Without prior notice, the medical board appeared at Gray's arraignment and requested that his medical license be suspended until resolution of the criminal conditions as a condition of bail. The trial court granted the bail condition, and Gray filed a writ of mandate petition in the Court of Appeal. The Court of Appeal noted that there are a number of statutory procedures under which the medical board may suspend a physician's license, all of which accord with due process. But the medical board ignored those statutorily mandated procedures. The Court of Appeal rejected the board's suggestion that "it can seek an immediate and indefinite suspension of a medical license without notice, evidence, or an adequate opportunity to litigate the issues, simply because criminal charges have been filed. We find no support for the proposition that the due process and proof required for a license suspension may be ignored when a criminal complaint has been filed against a licensee." (*Gray, supra,* 125 Cal.App.4th at p. 640.) The court additionally noted that had the medical board sought a preliminary injunction against Gray, the unverified criminal complaint would not have been "competent evidence demonstrating a serious threat of injury to the public. The complaint, by itself, does not provide the required evidentiary showing." (*Id.* at p. 641.)

*Gray* is distinguishable from this case.[17] The Commissioner here suspended Yousef's license under a specific statute providing for such suspensions, i.e., section 1748.5(e)(1). In contrast, the court in *Gray* was primarily concerned with the medical board's complete failure to follow any of the statutorily mandated procedures for suspending a physician's license. In bypassing the statute, the medical board afforded Gray no notice or opportunity to be heard *either before or after the suspension.* Thus, the court's statement that there is no "support for the proposition that the due process and proof required for a license suspension may be ignored when a criminal complaint has been filed against a licensee," was made in the specific context of the statutory scheme the medical board must follow before suspending a physician's license, which scheme specified an evidentiary burden of proof. (*Gray, supra,* 125 Cal.App.4th at p. 640.)

---

[17] We do not, however, agree with the Commissioner that *Gray* is distinguishable because it involves a professional license instead of a nonprofessional license. The court in *Gray* did not make a distinction between the process due before a professional license may be revoked as opposed to a nonprofessional license. Rather, it merely discussed the standard of proof at various hearings that might apply depending on whether the license was a professional or nonprofessional one.

■ But to the extent *Gray* can be construed as a general statement on what process is due before a license can be suspended, there *is* support for the proposition a license suspension may be based on the filing of a criminal complaint without a presuspension hearing: *Mallen, supra,* 486 U.S. at pages 241, 244–245, and *Gilbert, supra,* 520 U.S. at page 933.[18] Under that United States Supreme Court authority, where, as here, there has been a legislative finding that the immediate suspension of subject persons who have been charged with certain crimes is necessary to protect the insurance industry's integrity, due process is not violated by the absence of a *predeprivation* hearing, so long as a *postdeprivation* hearing is available.

It is thus to the postdeprivation hearing provided under section 1748.5 that we now turn.

### IV. *The postdeprivation hearing does not violate due process.*

■ Under section 1748.5, subdivision (f), a subject person who has been suspended under subdivision (e)(1) may seek immediate judicial review under Code of Civil Procedure section 1085. (§ 1748.5, subd. (f)(1)(B).) Alternatively, he or she may, within 30 days after a suspension order has been issued, apply for a "hearing on the order." (§ 1748.5, subd. (f)(1)(A).)[19] Yousef contends that the "hearing on the order" violates due process because it allows the Commissioner to rely on the charging instrument and because the hearing is not "on the merits," i.e., the subject person is not afforded an opportunity to dispute the criminal allegations. We agree with that assessment, but we disagree that the "hearing on the order" under section 1748.5, subdivision (f) violates due process.

■ Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner.[20] (*Barry, supra,* 443 U.S. at p. 66.) To be meaningful, a hearing need not be a full adversarial one. To the contrary, a hearing that excludes the issue of the subject person's guilt or innocence on an underlying criminal charge comports with due process. (See *Feinberg v. Federal Deposit Ins. Corp.* (D.D.C. 1976) 420 F.Supp. 109 (*Feinberg*). *Feinberg* held that title 12 of the United States Code section 1818(g), as

---

[18] The Court of Appeal in *Gray* did not address either *Mallen* or *Gilbert.*

[19] Yousef and American Liberty sought immediate judicial review rather than a postsuspension, administrative hearing.

[20] Yousef challenges the manner in which the postdeprivation hearing is held and not the time at which it is held. Indeed, the court in *Mallen* held that the postdeprivation hearing there was held in a sufficiently prompt manner. The hearing had to be held within 30 days of a request for a hearing, and a decision had to be rendered within 60 days of the hearing. (*Mallen, supra,* 486 U.S. at p. 236, fn. 6.) The postdeprivation hearing here is held in a more prompt manner. It must be held within 15 business days of the request, and the decision must be rendered within 30 days after the hearing. (§ 1748.5, subd. (f)(1)(A).)

originally enacted, was unconstitutional because it did not provide, among other things, for either a predeprivation or a postdeprivation hearing. In discussing what should occur at a postdeprivation hearing, the court said that "the question relating to [the] issuance of a Notice and Order of Suspension is not the person's guilt or innocence but, rather, whether the crime charged can be characterized as a crime involving 'dishonesty or breach of trust,' and whether the decision to issue a Notice and Order of Suspension in a particular case is necessary to further the legislative purpose of the statute." (*Feinberg*, at p. 118, fn. omitted.) The court went on to say that "the hearing will involve a complex legal question: whether the crime charged is one involving dishonesty or breach of trust, as well as a question requiring the subtle interrelation of fact and policy: the effect upon the public of the indictees holding office and participating in the affairs of the bank." (*Id.* at p. 120.)

After *Feinberg*, the statute was amended to provide for a postdeprivation hearing: " 'Within thirty days from service of any notice of suspension or order of removal . . . the director, officer, or other person concerned may request in writing an opportunity to appear before the agency *to show that the continued service to or participation in the conduct of the affairs of the bank by such individual does not, or is not likely to, pose a threat to the interests of the bank's depositors or threaten to impair public confidence in the bank.*' " (*Mallen, supra,* 486 U.S. at pp. 235–236, fn. 6, citing former 12 U.S.C. § 1818(g)(3), italics added.)[21] Thus, the hearing under section 1818(g)(3) is "on the order" as opposed to an adjudication of the subject person's guilt or innocence.

Yousef argues that the problem with limiting the hearing in this manner is that the Commissioner is allowed to rely solely on the criminal complaint to support the suspension. That is true, but it does not necessarily render the hearing meaningless. "[T]he fact that an indictment is considered *adequate* evidence to effect a suspension does not mean that the indictment is considered *conclusive* evidence." (*Rutigliano Paper Stock v. U.S. Gen. Serv. Admin.* (E.D.N.Y. 1997) 967 F.Supp. 757, 767 (*Rutigliano*).)

In *Rutigliano, supra,* 967 F.Supp. 757, Rutigliano and his company were indicted for various crimes concerning their business. Based on the indictment, the United States General Services Administration suspended them, under the Federal Acquisition Regulation (FAR) (48 C.F.R. §§ 9.401–9.407 (2005)), from receiving government contracts. The FAR provides that a

---

[21] The current version of title 12 United States Code section 1818(g)(3) provides that the affected person may request a hearing "to show that the continued service to or participation in the conduct of the affairs of the depository institution by such party does not, or is not likely to, pose a threat to the interests of the bank's depositors or threaten to impair public confidence in the depository institution." (12 U.S.C. § 1818(g)(3).)

contractor can be suspended upon adequate evidence. An indictment for specified crimes constitutes adequate evidence. If suspended, a contractor has the right to submit information and argument in opposition to the suspension, including any additional specific information raising a genuine dispute of material facts. But if the suspension is based on an indictment, the suspending official's decision is based on the administrative record, as well as the additional evidence, mitigating circumstances, the gravity of the charged offense, the probability of guilt, and well-founded claims of innocence. There are no additional factfinding proceedings. (*Rutigliano, supra,* at p. 762.)

The court in *Rutigliano* first rejected appellants' argument that the hearing was not meaningful because the government was allowed to rely on the indictment to justify the suspension. (*Rutigliano, supra,* 967 F.Supp. at p. 766.) The court suggested that the indictment gave rise to a rebuttable presumption, which the contractor could produce evidence to rebut. The court said, "[G]rounding a rebuttable presumption upon the indictment does not violate due process, since the indictment itself gives rise to a presumption of probable cause." (*Id.* at p. 767.) The court next rejected an argument that the absence of fact finding at the hearing violates due process: "The purpose of the opportunity to be heard is not to contest the indictment, but rather to demonstrate that the suspension should not be imposed, either because it is not in the government's interest to do so, or because in light of the compelling evidence presented by the contractor, a governmental decision to rely only on the indictment would be 'arbitrary, capricious, [or] in abuse of discretion' within the meaning of 5 U.S.C. § 706(2)(A).) [Citations.] In this context, due process does not require a full adversarial hearing and fact finding." (*Rutigliano, supra,* at pp. 767–768.)

Similarly, section 1748.5, subdivision (f)(1)(A), neither provides for a full adversarial hearing nor does due process require one. A person suspended under section 1748.5(e)(1) is entitled to a postdeprivation hearing. But the hearing is limited to a determination of (A) whether the crime charged is punishable by a term exceeding one year and involves a fraudulent act or an act of dishonesty in the acceptance, custody, or payment of money or property and (B) whether a failure to immediately issue the order threatens the financial solvency of an insurer or may cause financial or other injury to any person. The hearing is not one to determine the subject person's guilt or innocence on the underlying criminal charges, for a guilt determination is, we believe, potentially fraught with greater constitutional peril than a hearing on the order. An administrative hearing at which the subject person's guilt or innocence is at issue raises, among other things, collateral estoppel and Fifth Amendment issues. But those issues are avoided by limiting the hearing to the issue of whether the crime with which the

subject person has been charged involves the necessary elements under (A) and/or whether they pose a threat under (B).[22]

 Moreover, to aid a subject person in making that showing, the hearing must be conducted in accordance with Government Code section 11500 et seq. (§ 1748.5, subd. (i).) The Government Code requires the hearing to be conducted before an administrative law judge, and gives the parties an opportunity, for example, to conduct discovery and to call and to cross-examine witnesses. (Gov. Code, §§ 11502, 11507.6 & 11513.) The decision after the hearing is also subject to judicial review. (Gov. Code, § 11523.)

Therefore, contrary to Yousef's suggestion that the postdeprivation hearing is illusory, all the process that is due is afforded at the section 1748.5, subdivision (f)(1)(A), hearing.

V. *Section 1748.5 is not void for vagueness.*

Yousef makes the additional contention that section 1748.5(e)(1) is void for vagueness because it permits the Commissioner to suspend a license based on a finding that a failure to issue the order "may cause financial or other injury to any person."[23] We disagree.

 " 'Due process requires fair notice of what conduct is prohibited.' [Citation.] In that regard, a statute must be definite enough to provide a standard of conduct for citizens and guidance for officials to avoid arbitrary and discriminatory enforcement. (*Ibid.*) ' " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' [Citations.] A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it. [Citations.]" ' [Citations.] However, '[a] statute is not vague if, as here, any reasonable and practical construction can be given to its language. Reasonable certainty is all that is required. [Citations.]' [Citations.]" (*Valiyee v. Department of Motor Vehicles* (1999) 74 Cal.App.4th 1026, 1032–1033 [88 Cal.Rptr.2d 508].)

---

[22] The court in *Feinberg, supra,* 420 F.Supp. at page 118, footnote 21, similarly noted that because probable cause is not the question at a hearing under former title 12 United States Code section 1818(g), the government will not be forced into making premature disclosures, the individual will not have Fifth Amendment problems, and the criminal process will not be impermissibly intruded upon.

[23] Yousef also argues that the statute lacks clarity because it fails to specify to what process a suspended person is entitled. We have addressed and rejected that argument in part IV., *ante.*

Section 1748.5(e)(1) affords reasonable certainty to licensees as to what conduct might subject them to action thereunder. Indeed, the statute is quite specific. To avoid possible suspension, a subject person must avoid committing a crime (1) that is punishable by imprisonment for a term greater than one year and (2) that has as one of its elements a fraudulent act or an act of dishonesty in the acceptance, custody, or payment of money or property. Furthermore, the failure to issue an order may threaten an insurer's solvency or cause financial or other injury to any person. It thus seems quite clear that the statute is aimed at prohibiting those crimes that would impact the insurance business. For example, the crimes alleged against Yousef all arise out of conduct taken in connection with his bail bond business—kidnapping a man and holding him until he signed a bail agreement and forging documents to obtain security. These are the quintessential types of crimes at which the statute is aimed.

VI. *Section 1748.5 does not conflict with section 1807.5.*

Yousef contends that section 1807.5, rather than section 1748.5, provides the proper procedure for the suspension of licensed bail agents, and that section 1748.5 conflicts with section 1807.5. We do not agree.

 Section 1807.5 requires a predeprivation hearing before a bail agent's license may be suspended. Section 1807.5 provides, "The commissioner shall not suspend or revoke any license, issued under this article, without first granting a hearing, upon reasonable notice to the applicant, except that he may temporarily suspend any such license for a period not exceeding 15 days pending such hearing. Where a hearing is held under this section the proceedings shall be conducted in accordance with Chapter 5 of Part 1 of Division 3 of Title 2 of the Government Code, and the commissioner shall have all the powers granted therein." The difference between section 1807.5 and 1748.5 is section 1807.5 is limited to *licensees*. In contrast, section 1748.5 broadly applies to a "subject person" which includes licensed and unlicensed persons.

An argument can thus be made that section 1748.5(e)(1) is an "end-run" around section 1807.5's requirement of a predeprivation hearing, at least when section 1748.5(e)(1) is used against licensees. But a suspension order under section 1748.5(e)(1) can issue only under certain limited circumstances, namely, a subject person has been formally charged with certain types of crimes. This scheme suggests a legislative determination that the filing of a criminal complaint against a subject person, including a licensee, is a special, emergent circumstance justifying immediate action. We therefore will not second-guess the Legislature's determination it needs the special tool of section 1748.5(e)(1) to protect the public.

## DISPOSITION

The judgments are affirmed. All parties are to bear their own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

## APPENDIX

Section 1748.5 provides, in its entirety:

"(a) For the purposes of this section, the following definitions are applicable:

"(1) 'Production agency' means any person or organization licensed under Chapter 5 (commencing with Section 1621), Chapter 5A (commencing with Section 1759), Chapter 6 (commencing with Section 1760), Chapter 7 (commencing with Section 1800), or Chapter 8 (commencing with Section 1831).

"(2) 'Subject person' means any person who has participated or may participate in any manner in the business of a production agency, or any person licensed as a producer.

"(3) 'Insurer' means any domestic insurer, and any insurer that is admitted to transact insurance in this state, provided that if a subject person of an insurer is not a resident of California, or operating out of a place of business within California, then the subject person shall be engaged in direct management, direction, or conduct of the business of insurance in California in order to come within the provisions of this section.

"(b) If, after notice and a hearing, the commissioner finds all of the following, the commissioner may issue an order removing a subject person from his or her office or employment with the production agency and prohibiting the subject person from participating in any manner in the conduct of the business of an insurer or production agency, except with the prior consent of the commissioner:

"(1)(A) The subject person has engaged in misconduct with respect to the business of insurance that has caused financial or other injury to any person, or

"(B) The subject person has engaged in fraud, or willful acts or omissions involving dishonesty that exposed a person to financial or other injury; and

"(2) The subject person's conduct or practice demonstrates unfitness to continue as a subject person.

"(c)(1) If the commissioner gives written notice pursuant to subdivision (b) to a subject person, the commissioner shall immediately issue an order prohibiting the subject person from participating in any manner in the business of insurance, except with the prior consent of the commissioner, if the commissioner: (A) finds that failure to immediately issue the order threatens the financial solvency of an insurer or may reasonably be expected to cause irreparable injury to any person; (B) serves that subject person and the production agency with written notice of the suspension order; and (C) finds that all of the necessary factors are present which would permit the commissioner, after notice and a hearing, to issue an order pursuant to subdivision (b) removing a subject person from his or her office or employment with the production agency and prohibiting the subject person from participating in any manner in the business of an insurer or production agency.

"(2) Any suspension order issued pursuant to paragraph (1) of this subdivision shall be effective until the date the commissioner dismisses the charges contained in the notice served under subdivision (b) or paragraph (1) of this subdivision, the effective date of an order issued by the commissioner pursuant to subdivision (b), or a court issues a stay of the order pursuant to subdivision (d).

"(d) Within 10 days after a subject person has been served with an order of suspension pursuant to subdivision (c), the person may apply to the superior court of the county in which the principal office of the production agency is located for a stay of the order pending completion of the proceedings pursuant to subdivision (b), and the court shall have jurisdiction to issue an order staying the suspension. Nothing in this subdivision shall be deemed to authorize the court to issue a stay order on an ex parte basis.

"(e)(1) If the commissioner finds both of the following, he or she shall immediately issue an order suspending a subject person from his or her office or employment with a production agency and prohibiting the subject person from participating in any manner in the conduct of the business of an insurer or production agency, except with the prior consent of the commissioner: (A) the subject person has been charged in an indictment issued by a grand jury, or in an information, complaint, or similar pleading issued by a United States Attorney, district attorney, or other governmental official or agency authorized to prosecute crimes, with a crime punishable by imprisonment for a term exceeding one year and which involves as one of its necessary elements a fraudulent act or an act of dishonesty in the acceptance, custody, or payment of money or property; and (B) that a failure to immediately issue the order threatens the financial solvency of an insurer or may cause financial or other injury to any person.

"In the event the criminal proceedings are terminated other than by judgment of conviction, an order issued pursuant to paragraph (1) of this subdivision shall be deemed rescinded as if it had not been issued.

"(2) If the commissioner finds both of the following, he or she may immediately issue an order removing a subject person from his or her office or employment with a production agency and prohibiting the subject person from participating in any manner in the business of an insurer or production agency, except with the prior consent of the commissioner: (A) the person has during the preceding five years been convicted of a crime that is punishable by imprisonment for a term exceeding one year and has as one of its necessary elements a fraudulent act or an act of dishonesty in the accepting, custody, or payment of money or property; and (B) that a failure to immediately issue the order threatens the financial solvency of an insurer or may cause financial or other injury to any person.

"(3) The fact that any subject person charged with a crime involving as one of its necessary elements a fraudulent act or any act of dishonesty in the acceptance, custody, or payment of money or property is not convicted of that crime shall not preclude the commissioner from issuing an order regarding the subject person pursuant to other provisions of this code.

"(f)(1) Within 30 days after an order is issued pursuant to subdivision (c) or (e), the subject person to whom the order is issued may choose to do either of the following: (A) file with the commissioner an application for a hearing on the order. The commissioner shall, upon the written request of the subject person, extend the 30-day period by an additional 30 days provided the request is filed with the commissioner within 30 days after the order is issued. If the commissioner fails to commence the hearing within 15 business days after the application is filed, or within a longer period of time to which the subject person consents, the order shall be deemed rescinded as if it had not been issued. Within 30 days after the hearing, the commissioner shall affirm, modify, or rescind the order; otherwise, the order shall be deemed rescinded as if it had not been issued, or (B) petition for judicial review of the order pursuant to Section 1085 of the Code of Civil Procedure, where the court shall exercise its independent judgment on the evidence.

"(2) The right of any subject person to whom an order is issued pursuant to subdivision (c) or (e) to petition for judicial review of the order shall not be affected by the failure of that subject person to apply to the commissioner for a hearing on the order as provided by this subdivision.

"(g)(1) Any person to whom an order is issued pursuant to subdivision (b), (c), or (e) may apply to the commissioner to modify or rescind the order. The commissioner shall not grant the application unless he or she finds that it is reasonable to believe that the person will, if and when he or she becomes a subject person, comply with all of the applicable provisions of this code and of any regulation or order issued thereunder.

"(2) The right of any subject person to whom an order is issued pursuant to subdivision (b), (c), or (e) to petition for judicial review of the order shall not be affected by the failure of that subject person to apply to the commissioner pursuant to paragraph (1).

"(h)(1) It is unlawful for any subject person or former subject person to whom an order is issued pursuant to subdivision (b), (c), or (e) to do any of the following as long as the order is in effect, except with the prior consent of the commissioner: (A) to serve or act as a subject person for any insurer or production agency; or (B) to directly or indirectly vote any shares or other securities of an insurer or production agency.

"(2) If, after notice and a hearing, the commissioner finds that any subject person has violated paragraph (1) of this subdivision, the commissioner may order that subject person to pay to the commissioner a civil penalty, which may be recovered in a civil action, in an amount the commissioner may specify; provided however, that the amount of the civil penalty shall not exceed one thousand dollars ($1,000) for each day for which the violation continues.

"In determining the amount of civil penalty to be paid to the commissioner under this paragraph, the commissioner shall consider the financial resources and good faith of the subject person charged, the gravity of the violation, the history of previous violations by the person, and other factors as in the opinion of the commissioner may be relevant.

"(3) If, after notice and a hearing, the commissioner finds that any production agency has knowingly aided and abetted a subject person in a violation of paragraph (1) of this subdivision, or subdivision (h) of Section 728, the commissioner may order that production agency to pay to the commissioner a civil penalty in an amount the commissioner may specify; provided however, that the amount of the civil penalty shall not exceed one thousand dollars ($1,000) for each violation or in the case of a continuing violation, one thousand dollars ($1,000) for each day for which the violation continues, up to a maximum of fifty thousand dollars ($50,000). Continuation of the subject person's salary or other employee benefits pending final disposition shall not be considered aiding and abetting a subject person.

"In determining the amount of civil penalty to be paid to the commissioner under this paragraph, the commissioner shall consider the financial resources and good faith of the subject person charged, the gravity of the violation, the history of previous violations by the person, and other factors as in the opinion of the commissioner may be relevant.

"(i) Except as otherwise provided by this section, any hearing required by this section shall be conducted in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, subject to the following:

"(1) At the option of the subject person, all hearings shall be a closed session and private, and the records of the hearings shall not be made public unless the hearing results in a final order adverse to the subject person.

"(2) Where judicial review is sought by the subject person pursuant to Section 1085 of the Code of Civil Procedure, the court shall exercise its independent judgment upon the evidence.

"(3) When a subject person to whom an order has been issued pursuant to subdivision (c) or (e) applies to the commissioner for a hearing pursuant to subparagraph (A) of paragraph (1) of subdivision (f), the Office of Administrative Hearings shall schedule the hearing on a priority basis at the earliest possible time and once the hearing is commenced, it shall not be continued for more than three business days without the consent of the subject person.

"(4) If the Office of Administrative Hearings cannot schedule the commencement of a hearing within 15 business days as provided by paragraph (1) of subdivision (f), and the subject person does not waive his or her right to a hearing commencing within 15 days, the hearings may be conducted by administrative law judges appointed by the commissioner; the hearing shall be completed within 45 days of commencement, unless additional time is requested by the subject person. If the hearing is not completed within the 45 days, the order shall be deemed rescinded as if it had not been issued. The scheduling of other hearings before the administrative law judge shall not be considered good cause for purposes of this paragraph.

"(j) Nothing in this section is intended to or shall be construed to create a private cause of action against an offending subject person or insurer or production agency that aids and abets a subject person, based on the standards established by this section or the commissioner's findings or orders pursuant to this section."